IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TITUS HENDERSON,

                              Plaintiff,

        v.

                                                          OPINION and ORDER

CATHY A. JESS, TIM HAINES, L.R. IVERSON,
VICKI SEBASTAIN, PETER HUIBREGTSE,                          18-cv-680-jdp
T. OVERBO, CHAPLAIN EWING, G. BOUGHTON,
A. BROADBENT, and CO II BARTELS,

                              Defendants.

---

Plaintiff Titus Henderson, appearing pro se, is a Muslim inmate in the Wisconsin prison system. Henderson alleges that when he was incarcerated at the Wisconsin Secure Program Facility, staff there denied him Ramadan meals and prayer oil used for ritual purification. He brings claims under the First Amendment, Eighth Amendment, Equal Protection Clause of the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act (RLUIPA). Defendants have filed a motion for summary judgment, Dkt. 70. For the reasons stated below, I will grant defendants' summary judgment motion and dismiss the case.

PRELIMINARY MATTERS

I begin with several preliminary motions.

A.  Motion to compel discovery and for sanctions

Henderson has filed a motion to compel discovery and for sanctions against defendants' counsel. Dkt. 60. Henderson seeks discovery of defendants' Department of Corrections (DOC) disciplinary records; I take him to be saying that evidence of misdeeds against other inmates of the same race or religion would help show that they intended to discriminate against him.

Defendants argue that the documents wouldn't be useful to support Henderson's claims at the summary judgment stage because they aren't directly related to the events pertinent to this case. They say that those documents, if they should be produced at all, should not be produced until after the case has proceeded past summary judgment for purposes of assessing credibility at trial; they ask for a protective order withholding discovery of those documents until after the summary judgment stage. Dkt. 67.

I agree with defendants that these records could potentially be useful at trial for impeachment purposes, but not before then. So I will deny Henderson's motion to compel. Because this order results in dismissal of the case, I'll deny defendants' motion for a protective order as moot.

As for the motion for sanctions, Henderson says that counsel directed prison staff to confiscate case-related materials from him. In particular, he says that on September 29, 2019, counsel told Magistrate Judge Peter Oppeneer that she directed prison staff to confiscate Henderson's property. Henderson doesn't explain how he would have personal knowledge of counsel's conversation with Magistrate Judge Oppeneer and there's nothing in the record showing that this occurred.

Henderson also says that at his deposition, counsel spoke about the missing documents and told him, "I'm not interested in the truth. I have to defend my clients." Dkt. 60, at 4. Counsel responds by pointing to the deposition transcript, which shows that Henderson has misquoted her. At the deposition, Henderson said that he had documents memorializing interactions with staff members, but that he could not produce them to counsel because they had been confiscated. Counsel said that she would inquire with prison staff about the whereabouts of those documents but that she would then ask him for copies of those

documents. Henderson stated that he would produce the documents "[i]f it's your honest effort to show that you gonna investigate and stop the violations." Dkt. 62, at 80. Counsel responded, "Well, my role is obviously as a defense attorney in this case and I'm defending my clients, but I'm interested in having discovery of all relevant documents." *Id.* The only reasonable inference from this statement is that counsel was reminding Henderson that it wasn't her job to investigate wrongdoing by prison staff but that she'd try to find out what had happened to those documents. Counsel added that she didn't herself know what had happened to the documents.

The prison litigation coordinator told counsel that there was no record of legal materials being taken from Henderson's cell, but that there had been a June 2019 search of Henderson's cell for photos that turned up nothing. Counsel says that this "jogged [her] memory" that she had indeed ordered that search in response to reports that Henderson had nude photos of a correctional officer who is a defendant in this case. Counsel told prison staff to search Henderson's cell for those photos and to confiscate them as contraband. But there's no evidence that counsel directed the confiscation of Henderson's legal materials or did anything else sanctionable. I will deny Henderson's motion for sanctions.

## B.  Motion for extension of time

Henderson has filed a motion to extend his deadline to submit his materials in opposition to defendants' motion for summary judgment, stating that he placed his materials in the prison's mail stream to be e-filed by the law librarian about a week before his deadline, but COVID-19-related events delayed the e-filing process. Dkt. 90. But by the time he filed this motion the court had already received and docketed his materials. Although those materials were received four days after his deadline, I'll accept his statement that he placed

them in the mail stream before his deadline, so his filings are timely. *See Taylor v. Brown*, 787 F.3d 851, 858–59 (7th Cir. 2015) (under "mailbox rule," prisoner submission is deemed filed with court when he gives submission to prison officials for mailing). I'll deny his motion for an extension of time as moot.

## C. Motion for preliminary injunction

Henderson has filed a motion for preliminary injunction or temporary restraining order to enjoin staff at his current facility, Green Bay Correctional Institution, from blocking his participation in 2021 Ramadan meals (which start in mid-April) and otherwise harassing him. But his allegations are against a completely different set of staff members than the defendants in this case and the alleged discrimination and harassment at his current facility do not appear to be connected to the events of this lawsuit. These allegations belong in a separate lawsuit, so I will deny Henderson's motion.

Henderson also filed a motion to "reschedule" his proposed date for either a response by defendants or a hearing on his motion for injunctive relief, because of delays in his motion being e-filed by law library staff. Dkt. 105. Because I am denying his underlying motion for preliminary injunctive relief, I will deny this motion as well.

## UNDISPUTED FACTS

I begin the discussion of the facts by noting several problems with Henderson's summary judgment evidence.

Many of Henderson's proposed findings are unsupported by admissible evidence. For instance, Henderson asserts that the supervisory defendants ordered prison staff to falsify conduct reports or other disciplinary documents, but he does not support this with any proof

of directives from supervisory officials. He alleges that supervisory officials approved the denial of meals, but the evidence he submits in support refers to restrictions on how meals would be served to Henderson, such as in a paper bag instead of on a tray, or with Henderson kneeling in the back of his cell, not outright denials of meals. Also, the dates in which these restrictions were in place do not coincide with Ramadan months.

Henderson contends that were weeks-long periods of time in which he did not receive regular meals or other stretches where he was denied some meals. But this is not a case about a long-term deprivation of Henderson's meals; it concerns only meals during Ramadan for two years: 2010 and 2012. I won't consider irrelevant evidence about other issues.

Henderson also submits a state-court order from a proceeding in which Henderson unsuccessfully asked for an injunction to stop prison officials from fabricating reports and contaminating his food. The judge in that case quoted a 2007 "John Doe" proceeding in which another state-court judge stated that he would not issue a criminal complaint even though he concluded that there was "probable cause that a crime was committed" by prison staff. Dkt. 86-1, at 2. The judge reasoned that "the probability of successful prosecution is unlikely due to the lack of an identifiable defendant. There appears to have been a systemic failure by the Department of Corrections, instead of the failure to any particular individual." *Id.* Although the order doesn't state what particular crime there was probable cause to support, Henderson says that it involved prison officials threatening to kill him while using racial slurs and falsifying prison documents. But this case involved events in 2007 or earlier, and Henderson does not explain how those events relate to the specific claims in this case. So I won't consider that evidence.

The following facts are undisputed unless otherwise noted.

**A. Parties**

Plaintiff Titus Henderson was confined at Wisconsin Secure Program Facility (WSPF) from 2003 to 2015. Henderson's claims concern events that occurred between 2010 and 2014. He is currently confined at Green Bay Correctional Institution.

Defendant Cathy Jess was the Division of Adult Institutions (DAI) administrator for part of the events in question. The rest of the defendants all worked at WSPF during at least some of the events at issue. Peter Huibregtse, Tim Haines, and Gary Boughton each served as warden for a portion of the events. Anthony Broadbent was a food service administrator. Lorie Iverson was a food service supervisor. Vicki Sebastian was a corrections program supervisor. Todd Overbo was a chaplain. David Ewing was a unit officer and then a chaplain. Cheryl Bartels was a correctional officer.

**B. Prayer oil**

Henderson is a practicing Muslim. One of his religious practices is to perform Wudu, which he describes as "cleaning of yourself, washing your hands, your feet, your body, et cetera, because when you have a clean body, you have a clean mind." Dkt. 62, at 27–28. Henderson uses "prayer oil" during Wudu. He stated that during Wudu, "you spread [prayer oil] all over. That's purification of the body, so you use the prayer oil as a supplement while you're cleaning." *Id.* at 30.

Starting in March 2006, inmates falling within the Islamic and Pagan "umbrella religious group" have generally been allowed to purchase prayer oil. Over the years, prayer oil was added as allowable property for other umbrella groups as well. Inmates can have up to one ounce of prayer oil at a time. But inmates in segregation can be prohibited from possessing

prayer oil "[i]n accordance with individual offender segregation restrictions (i.e. observation/control placement)." Dkt. 78-4, at 11.

In his complaint, Henderson alleged that prison officials denied him prayer oil during Ramadan months from 2010 to 2014. Henderson did not attempt to purchase prayer oil himself. But Henderson says that prison staff would not let him have prayer oil purchased by family members from DOC-approved vendors.

## C. Ramadan meals

DAI policy allows for inmates to request dietary accommodations for certain holidays, including Ramadan fasting. Ramadan is an Islamic celebration held during the ninth month of the lunar calendar. During this month, Muslims around the world spend the daylight hours fasting; they eat only two meals per day before sunrise and after sunset. During Ramadan, prison staff arrange for participating inmates to receive two meals for the day, delivered to those inmates at times to meet the daylight fasting requirement.

Henderson's claims in this case relate to his Ramadan meals in 2010 and 2012.[1] Henderson states that he received few, if any, Ramadan meals in 2010 and 2012. Defendants agree that Henderson did not receive Ramadan meals in the second half of the 2012 Ramadan month. They say that he was removed from the Ramadan list for a series of incidents in which he physically assaulted or was disrespectful to officers who were bringing or taking away his Ramadan meals.

Defendants say that on August 6, 2012, Henderson assaulted non-defendant officer Thomas Brown by kicking him in the upper leg and groin. Henderson was placed in "control"

---

[1] I previously granted defendants' motion for summary judgment on exhaustion grounds regarding Henderson's claims about denial of Ramadan meals in other years. *See* Dkt. 50.

status, used for when an inmate is a danger to himself or others, exhibits disruptive or destructive behavior, or displays out-of-control behavior. The inmate is checked at the door by security staff at least every 30 minutes, and the inmate cannot leave his cell without security director approval.

According to defendants, on August 8, Henderson refused to hand his Ramadan meal tray back to officers. On August 9, officers Cockroft and Moris went to Henderson's cell to deliver his Ramadan meal. Henderson yelled, "Get my fucking bag you punkass bitches." Dkt. 78-5, at 58. Officer Cockroft gave Henderson an order to take his meal and then follow the "back of cell" restriction procedure. Henderson yelled, "Fuck you, lil bitch, I ain't going nowhere." *Id.* After more officers arrived and Henderson eventually backed away from the door, he threw a full milk carton at the trap, splattering officers with milk. Henderson stated that he would continue to assault officers any time he had the chance.

Upon learning of these incidents by email, non-defendant Security Director Jerome Sweeney emailed defendants Overbo and Broadbent, directing them to remove Henderson from the list of Ramadan participants because of his misbehavior. Overbo drafted a memorandum removing Henderson.

Henderson denies that he had been receiving Ramadan meals in the first half of the month or that any of these incidents occurred. Henderson says that at about this time, Overbo, Broadbent, and Iverson came to his cell and told him that he "was an asshole and this is why they was denying my participation in Islamic studies and prayer oil and religious books." Dkt. 62, at 75–76.

The court will discuss additional facts as they become relevant to the analysis.

8

ANALYSIS

I dismissed many of Henderson's claims on exhaustion grounds. Dkt. 50. The remaining claims relate to three alleged deprivations, for which Henderson asserts multiple legal claims. Here's a summary of the remaining claims:

- For Henderson's allegations that he was deprived of prayer oil, claims under RLUIPA, the First Amendment Free Exercise Clause, and equal protection race- and religious-discrimination and class-of-one theories.

- For his allegations that he was deprived of Ramadan meals in 2010, claims under RLUIPA, the First Amendment Free Exercise Clause, Eighth Amendment, and equal protection race- and religious-discrimination and class-of-one theories.

- For his allegations that he was deprived of Ramadan meals in 2012, claims under RLUIPA, the First Amendment Free Exercise Clause, Eighth Amendment, and an equal protection class-of-one theory.

I'll begin with the deprivation of prayer oil and its related claims, and then I'll turn to the Ramadan meal issues.

## A. Prayer oil

### 1. RLUIPA claims

RLUIPA prohibits prison officials from "impos[ing] a substantial burden on the religious exercise" of an inmate "unless the government demonstrates that imposition of the burden on that person . . . is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000cc-1(a). *See also Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012). Defendants contend that Henderson's RLUIPA claims regarding prayer oil are both untimely and moot.

The language of RLUIPA does not include a statute of limitations. But applying 28 U.S.C. § 1658, courts have concluded that the limitations period is four years. *See* § 1658 ("a civil action arising under an Act of Congress enacted after the date of the enactment of this

9

section may not be commenced later than 4 years after the cause of action accrues."); *see also*, *e.g.*, *Pouncil v. Tilton*, 704 F.3d 568, 573 (9th Cir. 2012) (applying § 1658 to RLUIPA). In his complaint, Henderson alleged that prison officials denied him prayer oil during Ramadan months from 2010 to 2014, identifying July 28, 2014, as the final date that was denied prayer oil, although he now says that he was denied prayer oil the entire time he was incarcerated at WSPF, up to his 2015 transfer to another prison. He also contends that the statute of limitations should be tolled because prison officials confiscated his personal and legal property for a several-year period. I do not need to decide the timeliness issue because his RLUIPA claims are moot regardless of the statute of limitations.

Only prospective relief is available under RLUIPA. A plaintiff may obtain an injunction or a declaration but not money damages. *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012). To obtain prospective relief, there must be a risk that the defendant will violate the plaintiff's rights again. *Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 395 (7th Cir. 2019). When a prisoner's claim relates to events at a particular prison, the general rule is that any request for prospective relief becomes moot if a prisoner is transferred because it is unlikely that the prisoner will be subjected to the same conditions again. *Thompson v. Bukowski*, No. 18-3009, 812 Fed. App'x. 360, 2020 WL 2097278, at *2 (7th Cir. May 1, 2020); *Maddox v. Love*, 655 F.3d 709, 716–17 (7th Cir. 2011); *Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009).

Henderson has received prayer oil at the Wisconsin prisons in which he's been incarcerated following his transfer to WSPF, WSPF's own policy prohibiting family members from ordering prayer oil for inmates has been eliminated, none of the defendants plausibly involved in denying him prayer oil are still employed at WSPF, and he otherwise can only speculate that he'd be transferred back to WSPF under the conditions that he said violated his

10

rights. Because Henderson's RLUIPA prayer-oil claims are moot, I'll grant defendants' motion for summary judgment on those claims.

### 2. First Amendment free exercise claims

To survive a motion for summary judgment on his free exercise claims, Henderson must "submit evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices." *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019) (citation omitted). A substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981). In the prison context, such a burden is justified if it is "reasonably related to a legitimate penological interest." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016) (citing *Turner v. Safley*, 482 U.S. 78, 89–91 (1987)).

In evaluating whether a challenged regulation or restriction is reasonably related to a legitimate penological interest, courts analyze the four factors established in *Turner v. Safley*, asking (1) whether there is a "valid, rational connection" between the restriction and a legitimate government interest; (2) whether the prisoner retains alternatives for exercising the right; (3) the impact that accommodation of the right will have an prison administration; and (4) whether there are other ways that prison officials can achieve the same goals without encroaching on the right. 482 U.S. at 89–91. In evaluating whether there is a valid, rational connection between a restriction and the government's legitimate penological interests, the initial burden of proof rests on the defendant government officials. *Singer v. Raemisch*, 593 F.3d 529, 536–37 (7th Cir. 2010). Once the defendants offer a "plausible explanation" for the restriction, the burden shifts to the plaintiff to present evidence undermining the state officials' explanation. *Id.*

As I explained to Henderson in my screening order, there is some uncertainty in the law about whether a plaintiff needs to prove that that the restriction is not part of a generally applicable neutral rule and that defendants substantially burdened his religious exercise. *See* Dkt. 9, at 3–4. But I need not resolve that uncertainty in this opinion. The case doesn't turn on whether the restriction was part of a generally applicable neutral rule. And Henderson has done enough to raise a reasonable inference that defendants substantially burdened his religious exercise.

Defendants contend that Henderson cannot show that the deprivation of prayer oil caused him a substantial burden on his religious practice because he admitted in his deposition that it wasn't mandatory to use prayer oil for Wudu washing; it isn't considered forbidden to go without prayer oil if it is not available.[2] But whether a religious item is mandatory is no longer the relevant test for determining whether a plaintiff faced a substantial burden. Courts have considered the "substantial burden" language in free exercise cases and RLUIPA cases to mean the same thing. *See Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 996–97 (7th Cir. 2006). And recent developments in RLUIPA cases have made that standard exceedingly easy for inmates to meet. *See Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015); *Tanksley v. Litscher*, No. 15-cv-126-jdp, 2017 WL 3503377, at *6 (W.D. Wis. Aug. 15, 2017) ("Just to be clear about where this leaves the substantial burden analysis: any prohibition of requested religious property will constitute a substantial burden on a religious exercise, thus placing the burden

---

[2] Henderson says otherwise in his declaration in support of his opposition brief: he says that prayer oil is mandatory. But under the "sham affidavit" rule, Henderson can't contradict his prior sworn testimony with a later affidavit or declaration. *See, e.g., Cook v. O'Neill,* 803 F.3d 296, 298 (7th Cir. 2015). So I will consider only his deposition statement about the necessity of prayer oil.

on the prison to justify that prohibition."), *aff'd*, 723 F. App'x 370 (7th Cir. 2018). So I won't dismiss this prayer oil claims for Henderson's failure to show a substantial burden.

As for the *Turner* factors, defendants give two security-based rationales for their restrictions on prayer oil, the first being staff's concern with incoming prayer oil being tampered with. They state that under the DOC's religious property policies in place during the years relevant to this case, inmates could obtain prayer oil only by purchasing it directly from the facility's canteen or the chaplain. *See* Dkt. 78-4, at 11; Dkt. 78-7, at 11. The policy was changed and now allows religious oil to be purchased from the DOC's catalog vendors. Based on Henderson's deposition testimony that he did not purchase the oil himself but rather his family sent it to him, defendants argued that Henderson would have been denied that oil for security reasons because oil sent directly from a family member could have been tampered with or been used to mask an illegal substance.

In response, Henderson says that his family didn't directly send the oil; they bought it from DOC-approved outside vendors. Both sides provide receipts for two denied vendor purchases, one from late June 2012 and one from late July 2012. Henderson says that there were many more purchases denied, although he does not provide receipts for those. Henderson adds that the prison allowed vendor purchases for other prisoners. In their reply to their proposed findings of fact, defendants appear to agree that it would have been acceptable for an inmate's family to order from a vendor: they say that had Henderson's family ordered the oil through approved vendors, it would not have been denied as "being mailed in from family." Dkt. 93, at 15, ¶ 32. And in their reply brief they "assume that if Henderson was denied oil ordered through approved vendors, it was denied because of his behavior." Dkt. 92, at 10.

It's unclear why defendants assume that oil bought by family through a vendor would have been allowed but for behavior reasons—the policy in effect at that time did not specifically allow purchase through a vendor, as opposed to the current policy, which includes vendor purchase as an option. But perhaps defendants make this assumption because a no-vendor-purchase policy would obviously fail the first *Turner* factor, at least regarding defendants' anti-tampering rationale. There would be no opportunity for Henderson's family to tamper with oil sent directly from a vendor. Presumably the canteen already receives oil directly from a vendor. And the DOC has amended the policy to allow for vendor purchases, which undercuts any rationale against them in earlier versions of the policy. The first *Turner* factor is often viewed as a "threshold" factor that can be dispositive for either party. *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) ("The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts."). Particularly given defendants' abandonment of the anti-tampering rationale in their reply brief, the first factor is decisive here. If Henderson's claim boiled down to defendants' anti-tampering rationale, I would likely conclude that his First Amendment rights were violated.

But defendants pivot to their second rationale—the prison's interest in security given that Henderson is an assaultive inmate. Defendants state that giving Henderson oil would make it dangerous for staff to attempt to physically restrain or move him, because he could use the oil to make himself slippery, to slip out of handcuffs, or to make the floor slippery. Other courts have upheld restrictions on prayer oil under similar security rationales. *See Ghashiyah v. Litscher*, 278 F. App'x 654, 657 (7th Cir. 2008); *Hammons v. Saffle*, 348 F.3d 1250, 1256–57 (10th Cir. 2003). That said, the restriction challenged here prevented Henderson from possessing one ounce of prayer oil, a very small amount that does not seem particularly risky

14

for a prisoner to have. And defendants do not share any history of misuse of oil by Henderson or other prisoners.

Prison officials considering an oil restriction had ample reason to consider Henderson as a security threat. It's undisputed that Henderson has been involved in physical altercations with correctional officers at least several times in the past, although Henderson maintains that he has always acted in self-defense. Henderson was convicted of battery by prisoner in a 2012 state-court case. From 2007 to 2015, Henderson was placed on a "back of the cell" restriction, which means that any time an officer opens the cell trap to place items in a cell or take items out, Henderson would have to face the back wall, kneel, and place his palms on the wall. This restriction is used to ensure officers' safety when dealing with an inmate considered physically assaultive.

Henderson disputes the allegations about his behavior by arguing the conduct reports were fabricated and all the physical altercations he was involved in were the fault of various officers. But the facts of the underlying events isn't the relevant point; it's what information the decisionmakers had when they denied Henderson's prayer oil. There's no question that his record shows a history of assaults, and defendants acted on the basis of that record. And this court generally must defer to prison officials in their determination of security problems and other prison concerns. *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 349–50 (1987). Henderson says that other assaultive inmates were allowed prayer oil but he doesn't provide enough details about their histories to undercut defendants' rationale.

Henderson says that around September 1, 2010, defendants Broadbent and Overbo came to his cell and told him that they were denying him Ramadan meals and prayer oil "because you're an asshole according to staff. Punishing you like this will help us get a position

as guards, You don't like it, appeal to [defendant] Sebastian." Dkt. 86, at 15. And at an unspecified time, Overbo told him that he was being denied prayer oil because he was "an asshole to prison staff." *Id.* at 13. Defendants suggest that these statements just prove their point that Henderson was denied oil because of his assaultive behavior. On defendants' motion for summary judgment, I cannot draw such inferences in defendants' favor; the statements also suggest personal animosity toward Henderson. But it doesn't matter what staff said to Henderson. In *Hammer v. Ashcroft*, 570 F.3d 798, 803 (7th Cir. 2009), the court held that a prison official's personal motives for taking a particular action are irrelevant under *Turner*. As explained in *Hammer*, what matters under *Turner* is whether there is a legitimate penological interest for a restriction, supported by a reasonable nexus between the penological interest and the restriction. The personal motivation of defendants is immaterial, as are the insulting comments.

Given this framework, the first *Turner* factor is a close call: I defer to prison officials' security decisions, but the amount of oil at issue is too small to pose a major threat. The remaining elements of the *Turner* analysis touch on how the policies or alternatives to those policies practically affect prisoners' rights and administration of the facility. Those factors tip somewhat toward defendants. I rejected defendants' argument that the deprivation of prayer oil was an insubstantial burden on Henderson's religious practice, but Henderson's deposition testimony shows that he may still perform Wudu washing without prayer oil, showing that he has an alternative, if inferior, means of performing his religious obligation. Henderson says that rather than denying him oil, staff could have distributed even smaller quantities of oil three times a day during medication pass. But that doesn't actually solve the problem because he'd

normally need oil five times a day, and he would still end up in possession of the oil—the security concern in the first place—only at a greater administrative burden to defendants.

The *Turner* analysis might be a close call, but even if Henderson could prevail under *Turner*, defendants are entitled to qualified immunity. That doctrine shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation omitted). A clearly established right is one that is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Henderson can show that the violation was clearly established if "a violation of this right has been found in factually similar case, or that the violation was so clear that a government official would have known that his actions violated the plaintiff's rights even in the absence of a factually similar case." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008). Law is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). Henderson bears the burden of demonstrating that his rights were clearly established to overcome qualified immunity. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011).

Some of the cases to which Henderson cites opposing qualified immunity are cases from outside of the Seventh Circuit not particularly on point factually, and they do not suggest that there is a consensus on cases factually similar to this one. Seventh Circuit cases he cites point

toward a general proposition that inmates in segregation still maintain a limited First Amendment right to practice their religion. *See Alston v. DeBruyn*, 13 F.3d 1036, 1040 (7th Cir. 1994) (complaint alleging that segregation inmates were deprived of access to religious programs was not frivolous); *Williams v. Lane*, 851 F.2d 867, 878 (7th Cir. 1988) (affirming ruling in favor of protective-custody inmates barred from religious programming). But Henderson doesn't present any cases more closely related to the facts of this case involving a specific religious item that prison officials believe will cause a security risk. Without any clear source of law prohibiting the restriction on prayer oil, defendants are entitled to qualified immunity on Henderson's free exercise prayer-oil claims. I will grant summary judgment to defendants on those claims.

### 3.  Fourteenth Amendment equal protection claims

In his summary judgment materials, Henderson notes that there were two white Wiccan inmates who received prayer oil even though he was not allowed it. But in his deposition, Henderson identified several other inmates who received prayer oil, some of whom were Black and Muslim. *See* Dkt. 62, at 38–39. And he doesn't otherwise provide any evidence that inmates were denied prayer oil because they were Black or Muslim. I'll grant defendants' motion for summary judgment on these claims because no reasonable juror could conclude that the prayer-oil decisions were based on inmates' race or religion.

### 4.  Equal protection class of one

Henderson contends that he was singled out for mistreatment at the prison, including deprivation of prayer oil. In his deposition, Henderson says that he was denied prayer oil because he "was considered the black asshole of Boscobel on Alpha Unit, so they treated me different from other inmates because they didn't like me." *Id.* at 34. I granted him leave to

18

proceed on equal protection claims under a "class of one" theory. Defendants seek summary judgment on these claims, contending in part that they are entitled to qualified immunity.

This court has previously expressed concern about applying class-of-one claims in a prison context. *See, e.g.*, *Key v. Shannon*, No. 17-cv-521-jdp, 2019 WL 3238638, at *7 (W.D. Wis. July 18, 2019). Neither Henderson's briefing nor my own research uncovers any case law establishing class-of-one claims in the prison context. Given the lack of clear instruction by higher courts, Henderson's rights are not clearly established, and defendants are entitled to qualified immunity. Therefore, I will grant defendants' motion for summary judgment on Henderson's class-of-one claims regarding the deprivation of prayer oil.

## B. Ramadan meals

### 1. Constitutional claims for 2010 meals

Defendants contend that Henderson's constitutional claims about denial of Ramadan meals in 2010 are barred on statute-of-limitations grounds. At the time of the events in question, the statute of limitations for a claim brought under 42 U.S.C. § 1983 in Wisconsin was six years. *Reget v. City of La Crosse*, 595 F.3d 691, 694 (7th Cir. 2010). Henderson filed this complaint in August 2018, almost eight years after Ramadan in 2010 ended in September.[3]

Henderson says that the statute of limitations should be tolled because prison officials confiscated his personal and legal property from 2010 to 2015, and staff and defendants' counsel continue to commit "fraudulent concealment" by confiscating his claims, blocking his ability to file lawsuits or understand his claims. *See* Dkt. 84, at 10.

---

[3] The parties do not explain precisely when Ramadan was celebrated in 2010, but I take judicial notice that it took place from early August to early September.

"Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations if despite the exercise of all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Shropshear v. Corp. Counsel of City of Chi.*, 275 F.3d 593, 595 (7th Cir. 2001). In the context of § 1983 claims, "the state, rather than the federal, doctrine of equitable tolling governs." *Id.* at 596. Although Wisconsin case law on equitable tolling is sparse, it is clear that, as in *Shropshear*, tolling is available only when the plaintiff's failure to meet a filing deadline is out of the plaintiff's control or occurred despite the plaintiff's due diligence. *See, e.g., State ex rel. Griffin v. Smith*, 2004 WI 36, ¶ 38, 270 Wis. 2d 235, 677 N.W.2d 259 ("[p]rovided that the petitioners timely pursue relief," time limit for filing writ of certiorari is equitably tolled where counsel promises to file writ but fails to do so); *State ex rel. Nichols v. Litscher*, 2001 WI 119, 247 Wis. 2d 1013, 635 N.W.2d 292 (30-day deadline for petition for review tolled on date pro se prisoner delivers correctly addressed petition to proper prison authorities for mailing).

Henderson does not persuasively show that prison officials barred him from understanding his claims or filing a complaint about the 2010 Ramadan meals. His claims concern events that happened directly to him, with prison officials either denying that they refused him meals or telling him why they denied him meals for particular time periods. And during this time Henderson was able to file documents—including amended complaints—in other cases in this court despite making the same arguments about confiscation of materials. *See Henderson v. Raemisch*, No. 09-cv-170-bbc (W.D. Wis.); *Henderson v. Raemisch*, No. 10-cv-335-bbc (W.D. Wis.). Henderson fails to show that he is entitled to toll the statute of limitations, so I will grant defendants' motion for summary judgment on his constitutional claims about the 2010 Ramadan meals.

### 2.  Free exercise claims for 2012 meals

In 2012, Ramadan was celebrated from July 19 through August 18. Henderson says that he was deprived of Ramadan meals the entire month. He says that this was caused in part by defendant Correctional Officer Bartels, to retaliate against Henderson ending his sexual relationship with Bartels in July 2012. He says that Bartels "authorized" non-defendant correctional officers Moris and Cockcroft to deny him meals on third shift. Dkt. 85, at 18, ¶ 72. Bartels says that she was working on first shift at the time, that she didn't have the authority to deny inmates meals, and that she didn't make any decision about meals with respect to Henderson.

Henderson's assertions would support a claim against Moris and Cockcroft for directly denying him meals, but Henderson didn't name them as defendants. He did name Bartels as a defendant, but as is common for many of his claims against supervisory officials, he asserts that Bartels "authorized" Moris and Cockcroft to deprive him of meals without explaining how he has personal knowledge that Bartels authorized Moris and Cockcroft's actions. His mere speculation that she did so is not enough to create a disputed issue of material fact for a claim against her. *See, e.g.*, *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)).

Henderson also states that on July 24, 2012, he wrote an "inmate complaint" to defendant Warden Haines about Bartels denying him Ramadan meals and that he was threatening a lawsuit. Dkt. 86, at 7. Henderson doesn't provide a copy of that complaint, but he does provide a copy of what he says is Haines's response: "Thank you for your note. I look

forward to working with you." Dkt. 86-21. Haines says that he does not remember these events but that he would not have written a letter responding to an inmate's complaint in that way. He assumes that his letter was a note that he "would send as a positive affirmation for [Henderson's] expression of some sort of prosocial behavior." Dkt. 96, at 2. I have to credit Henderson's version of the facts at the summary judgment stage. But even if Haines did give that response to Henderson, it wouldn't make him personally responsible for the underlying deprivation of Ramadan meals. If the document that Henderson sent Haines was an official inmate grievance, Haines was not the correct person to send it to. And if it was merely a letter, it wouldn't matter if Haines gave a rude response: there's no reason to think that the warden should be held liable for all problems raised by prisoners in letters outside of the formal procedures. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("[The plaintiff's] view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right.").

The parties agree that Henderson didn't receive Ramadan meals in the second half of the month. Defendants say that this was the result of non-defendant Security Director Jerome Sweeney's decision to remove Henderson from the Ramadan list following a series of incidents in which Henderson was abusive to the correctional officers who were bringing or taking away his meals: on August 6 he kicked Brown in the upper leg and groin; on August 8 he refused to give back his meal tray; and on August 9 he was verbally abusive toward staff, splattered milk on them, and threatened continued violence. After learning of these incidents by email,

Sweeney told Overbo to draft a memorandum removing Henderson from the Ramadan list. Defendants say that because non-defendant Sweeney was the person who made the decision to remove Henderson, none of the named defendants were personally responsible for the deprivation.

Henderson says that these events didn't occur, by which I take him to be saying that he did not misbehave in the way alleged by officers. But the truth of whether he assaulted or berated officers is immaterial because the decision to remove him from Ramadan meals was based on the *reports* of his behavior. And even if the reports were fabricated or embellished, it was by officers who aren't defendants. Throughout his summary judgment materials, he conclusory states that the supervisory defendants in this case told other prison officials to fabricate conduct reports against him. Without evidence of how he knows this occurred, I cannot credit his statements. Henderson also says that he was not placed in control status, but that statement is contradicted by his earlier deposition testimony that he was indeed in control status at that time. *See* Dkt. 62, at 103.

Henderson says that the August 6 conduct report for kicking Brown, and perhaps other conduct reports purportedly issued by Brown, were completely fabricated by supervisory defendants or defendants' counsel. As proof he compares the August 6 report with two others purportedly authored by Brown (who is now deceased), which he says have different handwriting. *See* exhibits to Dkt. 101. From my review of these documents, it's at least plausible that they were written by different people. Henderson asks the court to enter default judgment against defendants for fabricating evidence. Dkt. 91.

Defendants respond by providing declarations from correctional officers, stating that some officers prefer to have another officer write out the report form for them because the

observing officer "may feel he or she does not have good enough handwriting, grammar, or narration skills." Dkt. 99, at 2. Officer Russell Hill says that he wrote the August 6 conduct report at Brown's behest. Dkt. 100, at 2. Henderson responds with a 2013 state-court transcript in which Brown stated that the handwriting on the August 6 report was his. Dkt. 103-1, at 8–9.

Henderson has raised a genuine dispute of fact over the true authorship of the August 6 report as well as Brown's other reports. But that still doesn't raise a reasonable inference that defendants or counsel *fabricated* the reports, so I'll deny Henderson's motion for default judgment. Henderson also says that the report wasn't in his disciplinary files, suggesting that counsel created the report later, but statements about the August 6 incident are included in contemporaneous emails in which officials discuss his misconduct. And in any event, the existence of the conduct report itself is irrelevant to Henderson's free exercise claims: defendants show that Sweeney was informed by email of the August 6 incident and related disruptive incidents, which led him to remove Henderson from the Ramadan list.

If non-defendant Sweeney was the person responsible for removing Henderson from the Ramadan list, then Henderson's claims fail because he isn't suing the person actually responsible for the deprivation. Henderson attempts to show that some of the named defendants are responsible for terminating him from the Ramadan list. Henderson says that non-defendant Captain Mason told him that various officials, including defendants Haines, Overbo, and Broadbent "wanted" Henderson removed, and showed her a memorandum stating that. But Mason's statement merely reiterates that there was a memorandum removing Henderson from Ramadan. There's no evidence suggesting that the memorandum is false or that Overbo or any other named defendant drafted it independently of Sweeney's instructions.

24

Henderson also says that defendants Overbo, Broadbent, and Iverson told him that he was an asshole, and that they could punish him however they wanted, but none of the alleged remarks suggest that these defendants were the ones responsible for the Ramadan decision instead of Security Director Sweeney.

Because Henderson fails to create a disputed issue of material fact over whether any of the named defendants were responsible for removing him from the Ramadan list, I will grant summary judgment to defendants on his free exercise claims about deprivation of Ramadan meals in 2012.

Alternatively, even had Henderson shown that Overbo or other named defendants were responsible for taking him off the list, they would still be entitled to summary judgment. The question under *Turner* would be whether cutting off Henderson's Ramadan meals was reasonably related to a legitimate penological interest. Given the deference that I must afford prison officials in making security-related decisions, it's difficult to see how officials would run afoul of *Turner* by removing Henderson from the Ramadan list after reports that he repeatedly physically assaulted, verbally abused, or defied staff concerning his Ramadan meal trays. And in any event, I am aware of no binding authority clearly establishing that prison staff violate the Free Exercise Clause by terminating an aspect of a prisoner's religious practice after the inmate abuses that very practice. So defendants would be entitled to qualified immunity for those claims.

### 3.  Equal protection class-of-one claims for 2012 meals

For the same reasons that defendants are entitled to qualified immunity on Henderson's class-of-one claims regarding the deprivation of prayer oil, they are entitled to qualified

immunity for his class-of-one claims about the deprivation of Ramadan meals. I will grant summary judgment to defendants on those claims.

### 4. Eighth Amendment claims for 2012 meals

Henderson alleges that he was physically harmed by defendants' deprivation of Ramadan meals. I granted Henderson leave to proceed on Eighth Amendment claims regarding the deprivation of those meals. But since then I've followed other district courts by concluding that a prisoner's claims about a lack of accommodation for religious meals where ordinary meals are still available "should be resolved based on the legality of the administrative requirements under the First Amendment and RLUIPA," not the Eighth Amendment. *Kyle v. Goff*, No. 20-cv-460-jdp, 2020 WL 3316140, at *3 (W.D. Wis. June 18, 2020) (citing *Harris v. Cearlock*, No. 17-CV-3307-JBM, 2018 WL 5777472, at *2 (C.D. Ill. Nov. 2, 2018); *Wallace v. Miller*, No. 09-CV-342-JPG, 2010 WL 2836987, at *5 (S.D. Ill. July 20, 2010); *Powell v. Raemisch*, No. 10-CV-202-BBC, 2010 WL 2429709, at *7 (W.D. Wis. June 11, 2010)). In short, if regular meals were still available to Henderson, he can't maintain an Eighth Amendment claim for failing to eat them.

Other than his conclusory allegations that WSPF staff tried to starve him over his entire time imprisoned there, Henderson does not provide specific facts indicting that any of the named defendants interfered with his regular meals during the events relevant to his claims in this lawsuit. So I will grant summary judgment to defendants on these claims.

### 5. RLUIPA

Henderson also brings RLUIPA claims about the deprivation of his Ramadan meals. But based on my discussion above regarding Henderson's other Ramadan claims, it's clear that his RLUIPA claims are moot given his years-ago transfer out of WSPF. Henderson provides no

26

evidence about his time at WSPF that would justify this court granting him declaratory or injunctive relief regarding any DOC-wide policies that would apply at his current prison. I will grant defendants' motion for summary judgment on these RLUIPA claims. Because I am granting summary judgment to defendants on all of Henderson's claims, the entire case will be dismissed.

ORDER

IT IS ORDERED that:

1.  Plaintiff Titus Henderson's motion to compel discovery, Dkt. 60, is DENIED.

2.  Defendants' motion for protective order, Dkt. 67, is DENIED as moot.

3.  Plaintiff's motion for sanctions, Dkt. 60, is DENIED.

4.  Plaintiff's motion for extension of his deadline to submit his material in opposition to defendants' motion for summary judgment, Dkt. 90, is DENIED as moot.

5.  Plaintiff's motion for preliminary injunctive relief, Dkt. 104, is DENIED.

6.  Plaintiff's motion to reschedule preliminary injunction proceedings, Dkt. 105, is DENIED.

7.  Plaintiff's motion for default judgment, Dkt. 91, is DENIED.

8.  Defendants' motion for summary judgment, Dkt. 70, is GRANTED.

9.  The clerk of court is directed to enter judgment accordingly and close the case.

Entered March 19, 2021.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge